IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| CAROLINA STEEL CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| PALMETTO BRIDGE CONSTRUCTORS, ) | C.A. No.: 2:05-1178-PMD |
| FLATIRON CONSTRUCTORS, INC., ) | |
| TIDEWATER SKANSKA, INC., AMERICAN ) | |
| HOME ASSURANCE COMPANY, FEDERAL ) | **AMENDED FINDINGS OF FACT** |
| INSURANCE COMPANY, FIDELITY & ) | **AND CONCLUSIONS OF LAW** |
| DEPOSIT COMPANY OF MARYLAND, ) | |
| NATIONAL UNION FIRE INSURANCE ) | |
| COMPANY OF PITTSBURGH, PA and ) | |
| ZURICH AMERICAN INSURANCE COMPANY, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

This matter was tried without a jury from Monday, April 24, 2006, through Wednesday, April 26, 2006. The court – having heard the arguments, read the briefs of counsel, and considered the evidence, including the testimony of live witnesses, deposition testimony, and exhibits – enters a judgment in favor of Plaintiff Carolina Steel Corporation ("CSC") in the amount of $1,062,816.61, plus interest thereon from February 18, 2005, at the legal rate of 8¾ percent, pursuant to S.C. Code Ann. § 34-31-20.

**FINDINGS OF FACT**

1.    This case arises from a contractual dispute between Plaintiff CSC and Defendant Palmetto Bridge Constructors, Inc. ("Palmetto").

2.    CSC is a North Carolina corporation qualified to do business in South Carolina.

3.    Defendant Palmetto is a joint venture between Defendant Tidewater Skanska, Inc. ("Tidewater") and Defendant Flatiron Constructors, Inc. ("Flatiron"). Hereinafter, the court

collectively refers to Defendants Palmetto, Tidewater, and Flatiron as "PBC."

4. PBC, as prime contractor, entered into a contract ("the Prime Contract") with the South Carolina Department of Transportation ("SCDOT") to perform a construction project ("the Project") commonly referred to as the Cooper River and Town Creek Bridge in Charleston, South Carolina, and more specifically identified by SCDOT File Numbers 10.257A & 10.432A and SCDOT Identification Number 7227.

5. In conjunction with the Prime Contract and the Project, PBC, as principal, and American Home Assurance Company ("American"), Federal Insurance Company ("Federal"), Fidelity & Deposit Company of Maryland ("Fidelity"), National Union Fire Insurance Company Of Pittsburgh, PA ("National"), and Zurich American Insurance Company ("Zurich") (hereinafter collectively referred to as "the Sureties") issued a payment bond (the "Bond") and bound themselves, jointly and severally, pursuant to S.C. Code Ann. §11-35-3030, to ensure the payment by PBC of the claims of all persons furnishing labor or materials, or both, in the prosecution of the Project.

6. The Project was a "design-build" project. As a result, the final design was not complete when CSC bid the Project. CSC based its bid on five drawings (the "As-Bid Drawings") provided by PBC; the five As-Bid Drawings all related solely to the interchange bridges and did not reflect that the Project would incorporate a seismic design rather than a standard SCDOT design.

7. In discussions during the summer and fall of 2001, CSC contemplated entering into a joint venture with High Steel Structures, Inc. ("High Steel") and Augusta Iron & Steelworks, Inc. ("Augusta Iron"), whereby CSC, High Steel, and Augusta Iron would jointly fabricate all of the steel required for the Project.

8. Plaintiff contends that it did not form a joint venture with High Steel and Augusta

2

Iron. Moreover, CSC asserts that it never authorized High Steel or Augusta Iron to represent CSC in any capacity and that neither High Steel nor Augusta Iron ever did so. Rather, Plaintiff CSC asserts that it represented its own interests at all times.

9.    Based upon CSC's bid, PBC awarded CSC a Purchase Order ("Purchase Order"), dated November 2, 2001, wherein CSC agreed to detail, furnish, fabricate, prime, paint, and deliver certain structural and miscellaneous steel to PBC for use in the Project.

10.   The Purchase Order originally required CSC to supply approximately 11,514,080 pounds of steel for the Charleston interchange bridges and provided that CSC be paid at the unit cost of $0.933 per pound of steel supplied for the Project.

11.   Because the Project was a design-build project, the Purchase Order included a clause providing that a "[s]ubstantial deviation in design may necessitate a change in cost which will be determined on a case by case basis per the Terms and Conditions of the Purchase Order." (Vol. I, Ex. 11.) The Purchase Order set forth the following examples of a substantial deviation in design: "changing fillet welds to full penetration welds, changing straight girders to curved, changing structure designed as an I-girder structure to boxes, and changes in lengths of individual girders that exceed 160 lineal feet." (Vol. I, Ex. 11.)

12.   In August of 2002, PBC furnished to CSC the Released For Construction Drawings ("RFC Drawings") for two of the nine interchange bridges for which CSC was responsible. The RFC Drawings reflected, among other things, that the interchange bridges had increased weight and complexity because of, among other things, earthquake, hurricane, and ship collision criteria. Due to the various bridge design changes and because CSC assumed the obligations of Augusta Iron, CSC ultimately supplied more than 20 million pounds of steel to PBC for the Project.

13.   CSC asserts that on September 4, 2002, it made proposals for simplifying the design

3

during a meeting with PBC and the Project's designers. For example, CSC asserts that it made suggestions to simplify the girder webs, intermediate cross frames, cross box diaphragms, end plate diaphragms, and temporary cross frames. (Vol. I, Ex. 15.) However, CSC claims that its suggestions were not incorporated into the Project.

14.     CSC asserts that it fully and timely performed its obligations under the Purchase Order.

15.     CSC last furnished materials for the Project on or about February 4, 2005.

16.     CSC states that it invoiced PBC for $21,654,130.55, but that PBC has only paid $20,108,142.16.[1] CSC claims that it timely served upon Defendants notice of its claim under the Bond as well as its formal Proof of Claim for the outstanding balance which was then due and owing to CSC under the terms of the Purchase Order.

17.     On or about July 14, 2004, PBC's Joint Venture Executive Committee instructed PBC's management to "[a]udit representative shop drawings of structural steel and rebar for exact final payments to subcontractors and suppliers and for the E&O claim" and to "[v]igorously dispute vendor/subcontractor claims for extras." (Vol. I, Ex. 41.)

18.     Thereafter, PBC identified the following six issues to support its withholding of payment to CSC: (a) straddle bents; (b) increased web thicknesses; (c) intermediate cross frames; (d) cross box diaphragms and end plate diaphragms; (e) tie-in steel; and (e) temporary cross frames.

19.     PBC did not notify CSC that it would be withholding payment until August of 2004.

---

[1] CSC's principal claim is for $1,545,988.39, which is less than the sum of the totals of the six issues set forth by the parties (straddle bents, increased web thickness, intermediate cross frames, cross box and end plate diaphragms, tie-in steel, and temporary cross frames). CSC asserts that this is because of the difficulties and variances associated with estimating and calculating some of the weights associated with items for which PBC has already paid, but which the parties still dispute.

20.     CSC asserts that on February 18, 2005, it demanded that the Sureties make a fair and reasonable investigation of the merits of the amounts CSC claims PBC owes.  CSC asserts that it also demanded that PBC and the Sureties pay the entire amount due or pay whatever amount was deemed due after investigation, as required by S.C. Code Ann. § 27-1-15.

21.     Plaintiff CSC asserts that Defendants did not make a fair and reasonable investigation into the merits of the amounts CSC claimed PBC owed to it.  CSC states that although PBC made a partial payment to CSC after February 18, 2005, no evidence exists that the Sureties made any investigation after February 18, 2005.  Rather, CSC asserts that PBC's entire investigation concluded in January of 2005, more than a month before CSC made its demand.  Therefore, CSC asserts that it is entitled to recover attorney's fees and interest at the statutory rate from February 18, 2005, as provided in S.C. Code Ann. § 27-1-15.

### a.     Straddle Bents

22.     The parties agree that the straddle bents constitute a substantial deviation in design, resulting in an increased unit cost of $1.47 per pound.  (Vol. III, Ex. 105.)  However, the parties disagree as to the actual weight calculation, particularly with respect to the straddle bents on Line 1 and Line 3.  Plaintiff CSC bears the burden of proof with respect to this issue.

23.     The Purchase Order provided that "[p]ayment for delivered material will be based on the calculated 'shipping weights' as shown on the Approved Shop drawings at unit prices detailed under the 'Work Description' section of this document.  (Vol. I, Ex. 11.)

24.     CSC contends that it calculated all of the weights associated with the straddle bents in accordance with the Purchase Order and using the same method it used to calculate the weights associated with all of the other steel it fabricated for the Project.

25.     CSC claims that with the exception of the straddle bents, PBC did not object to

5

CSC's method of calculation. CSC also asserts that PBC did not notify CSC of its objection to the straddle bents calculation until after CSC fabricated and shipped the straddle bents to the Project.

26. According to CSC, it furnished 876,701 pounds of steel relating to the straddle bents, but PBC only paid for 865,266 pounds of steel. Thus, CSC seeks an additional $16,809.45 ((876,701 – 865,266) x $1.47).

27. In contrast, PBC contends that CSC is entitled to payment for only 853,831 pounds of steel at the unit cost of $1.47 per pound.

### b.   Increase in Web Thicknesses

28. The parties agree that the increase in web thicknesses did not constitute a substantial deviation in design. Therefore, the unit cost of $0.933 applies. However, the parties dispute the weight calculation. PBC bears the burden of proof with respect to this issue.

29. PBC contends that CSC requested the increase in web thicknesses in order to reduce the number of stiffeners in the curved girders, effectively eliminating substantial labor costs for CSC.

30. In contrast, CSC contends that it did not request the increase in web thicknesses, but rather, that High Steel requested the increase in web thicknesses at a meeting in January of 2002, attended by High Steel, PBC, and Parsons Brinkerhoff. CSC asserts that it was not present at this meeting and that at no time in January or February did CSC request changes to the web thicknesses or to the intermediate web stiffeners.

31. When it bid the Project, CSC estimated it would need to fabricate 1713 intermediate web stiffeners.

32. According to the original bridge design drawings, dated April 30, 2001, the girders were mostly ½ of an inch thick. However, the RFC Drawings, which were issued on August 2,

2002, and August 12, 2002, reflected an increase from ½ of an inch to ⅝ of an inch in the web thicknesses for most of the girders. The RFC Drawings also reflected that the intermediate web stiffeners had not been eliminated.

33.     CSC asserts that its only recommendation with regard to the web thicknesses occurred after the web thicknesses already had been increased from ½ inch to ⅝ inch. Specifically, CSC asserts that on August 30, 2002, after the RFC Drawings with the ⅝ inch-thick girders had been issued, it suggested a design option to PBC to further increase the web thicknesses in order to eliminate the intermediate web stiffeners. However, CSC's recommendation to further increase the web thicknesses was not incorporated into the design.

34.     According to the RFC Drawings, the web thicknesses were increased from ½ inch to ⅝ inch for all bridges except for Line 13, the only Line where the web thicknesses were increased from ½ inch to ⅞ inch and where the intermediate web stiffeners were eliminated.

35.     CSC claims that although the web thicknesses increased initially from ½ of an inch to ⅝ of an inch, the number of intermediate web stiffeners did not decrease. Rather, CSC asserts that it fabricated 698 more intermediate web stiffeners than it had anticipated.

36.     CSC contends that it furnished 1,024,054 pounds of steel relating to the increase in web thicknesses but that PBC only paid for 961,543 pounds relating to this issue. Thus, CSC seeks an additional $58,322.76 ((1,024,054 – 961,543) x $0.933).

37.     Because PBC contends that CSC requested the increase in web thicknesses and that the increase in web thicknesses resulted in a reduction in the number of intermediate web stiffeners, PBC takes the position that it is not liable for the weight of the increased web thicknesses.

### c.     **Intermediate Cross Frames**

38.     The parties agree that the changes to the intermediate cross frames did not constitute

a substantial deviation in design. Thus, the unit cost is $0.933 per pound. However, the parties dispute the amount of weight for which CSC is entitled to payment. PBC bears the burden of proof with respect to this issue.

39. The As-Bid Drawings reflected intermediate cross frames similar to standard SCDOT cross frames. However, the intermediate cross frames were changed, as first reflected in the RFC Drawings from August of 2002, which called for intermediate cross frames with "Heavy T's."

40. On August 30, 2002, CSC informed PBC that the "Heavy T" cross frames required a considerable more amount of material, bolts, and welding than the original cross frames, and CSC suggested to PBC that it consider using the standard cross frames as indicated on the As-Bid Drawings.

41. PBC's designers responded to CSC that seismic requirements precluded the use of the standard cross frames. However, PBC's designers investigated whether they could replace the intermediate cross frames with bent plate diaphragms. CSC responded that it would prefer to use angle cross frames if the angles could be made of a smaller size and still carry the required loads.

42. Because the difference in cost between the bent plate diaphragm option and the angle cross frame option was negligible and because CSC preferred the angle cross frames, PBC decided to drop the bent plate diaphragm option and proceed with the angle cross frame.

43. PBC asserts that the angle cross frames are heavier than the "Heavy T" cross frames indicated on the RFC Drawings.

44. PBC takes the position that it is not liable for the payment associated with the increased weight of the redesigned cross frames because the change in design occurred as a result of CSC's desire to reduce its labor costs.

45. CSC contends that both the heavy angle and the "Heavy T" cross frames are heavier

than the standard cross frames included in the As-Bid Drawings, but that the heavy angles it suggested are lighter than the "Heavy T" cross frames in the RFC Drawings.

46.     CSC asserts that it supplied 1,663,834 pounds of steel relating to the intermediate cross frames, but that PBC only paid for 1,075,240 pounds of steel relating to this issue. Thus, CSC seeks an additional $549,158.20 ((1,663,834 – 1,075,240) x $0.933).

### d.     Cross Box Diaphragms and End Plate Diaphragms

47.     The parties disagree about whether the fabrication of the cross box diaphragms and end plate diaphragms constitutes a substantial deviation in design.

48.     CSC contends that the cross box diaphragms and end plate diaphragms constitute a substantial deviation in design, and therefore, CSC seeks payment of an increased unit price. CSC bears the burden of proof relating to this issue.

49.     In contrast, PBC takes the position that the fabrication of the cross box diaphragms and end plate diaphragms does not constitute a substantial deviation in design and that the unit cost of $0.933 therefore applies.

50.     The As-Bid Drawings did not show the cross box diaphragms and end plate diaphragms. Rather, the cross box diaphragms and end plate diaphragms were added to the Project design as new items. Additionally, the first design drawings showing the cross box diaphragms and end plate diaphragms related only to Line 3.

51.     After receiving the first drawings depicting the cross box diaphragms and end plate diaphragms, CSC notified PBC that it considered these added items to be a substantial deviation in design, and CSC provided pricing for the new items to PBC.

52.     Before CSC began fabricating for these items, John Gray, PBC Vice President of Procurement, authorized CSC to fabricate the cross box diaphragms and end plate diaphragms on

Line 3 at the rates of $2.77 per pound for cross box diaphragms and $3.43 per pound for end plate diaphragms.

53.     Based on Gray's authorization of the increased unit costs for the cross box diaphragms and end plate diaphragms on Line 3, CSC fabricated the cross box diaphragms and end plate diaphragms for all of the lines on the Project.

54.     PBC admitted that there is no difference between the cross box diaphragms and end plate diaphragms on Line 3 and the cross box diaphragms and end plate diaphragms on the other lines. However, PBC asserts that although it authorized CSC to fabricate the cross box diaphragms and end plate diaphragms on Line 3 at the increased unit costs, it did not authorize CSC to fabricate the cross box diaphragms and end plate diaphragms on any of the other lines at the increased unit costs.

55.     PBC did not notify CSC of its contentions that the cross box diaphragms and end plate diaphragms did not constitute a substantial deviation in design or that PBC's authorization of increased unit costs related only to line 3 until CSC had almost completed its fabrication and shipment of the cross box diaphragms and end plate diaphragms.

56.     CSC contends that all of the cross box diaphragms and end plate diaphragms constituted a substantial deviation in design – not just the cross box diaphragms and end plate diaphragms on Line 3 – and that PBC owes CSC $2.77 per pound for cross box diaphragms and $3.43 per pound for end plate diaphragms.

57.     CSC furnished 30,294 pounds of steel relating to the cross box diaphragms and 141,507 pounds of steel relating to the end plate diaphragms.

58.     PBC paid CSC for $0.933 per pound of steel relating to the cross box diaphragms and end plate diaphragms.

59.  CSC asserts that PBC is liable for an additional $55,650.08 for cross box diaphragms (($2.77 - $0.933) x 30,294 pounds) and an additional $353,342.98 for end plate diaphragms (($3.43 - $0.933) x 141,507 pounds).

### e. Tie-In Steel

60.  Tie-in steel is comprised of rolled beams and short plate girders. During the course of the Project, CSC was required to supply a substantial amount of additional tie-in steel to connect the new bridge to the old bridges.

61.  The parties disagree about whether the fabrication of tie-in steel constitutes a substantial deviation in design. PBC bears the burden of proof with respect to this issue.

62.  CSC asserts that the fabrication of tie-in steel does not constitute a substantial deviation in design. CSC contends that it anticipated the use of tie-in steel on the Project when it initially bid the Project and that the blended rate of $0.933 included "beams" and "girders." CSC asserts that the blended rate of $0.933 was lower than it would have been if CSC had not anticipated fabricating tie-in steel.

63.  PBC contends, on the other hand, that the incorporation of tie-in steel constitutes a substantial deviation in design that entitles it to pay a lower price than that unit cost of $0.933 per pound. Specifically, PBC asserts that it is entitled to pay CSC at a unit cost of $.61 per pound.

64.  CSC furnished 1,655,612 pounds of tie-in steel, for which PBC paid CSC $0.61 per pound.

65.  CSC asserts that PBC is liable for an additional $534,762.68 (($0.933 - $0.61) x 1,655,612).

### f. Temporary Cross Frames

66.  The parties disagree about whether the fabrication of temporary cross frames

11

constitutes a substantial deviation in design. CSC bears the burden of proof with respect to this issue.

67. Specifically, CSC contends that the fabrication of the temporary cross frames constitutes a substantial deviation in design and that a unit cost of $1.42 per pound applies.

68. In contrast, PBC contends that the fabrication of the temporary cross frames does not constitute a substantial deviation in design and that, therefore, the $0.933 unit cost applies.

69. During the course of the Project, CSC was required to provide temporary cross frames; the original design of the Project did not include temporary cross frames.

70. On July 1, 2003, CSC sent PBC a letter informing PBC that its unit cost would be $2.01 per pound for temporary cross frames.

71. In response, PBC eliminated the re-detailing and the drilling of the girder stiffeners and instructed CSC to provide primed-only cross frames and revise its quote.

72. CSC revised its quote and reduced the price to $1.42 per pound.

73. PBC wanted to reduce the price to the $0.933 unit cost in the Purchase Order.

74. CSC suggested that it could reduce the price if PBC undertook some of the work associated with the "hat section" in the field, which PBC was not willing to do.

75. According to CSC, Bob Rice's handwritten notes dated July 22, 2003, indicate that Brian Gordon (for PBC) authorized CSC to fabricate the items for the unit price of $1.42 per pound.

76. Also on July 22, 2003, CSC completed a "record of order," instructed CSC's shop to begin fabrication, and sent a letter to PBC quoting the increased unit cost of $1.42 per pound for the temporary cross frames. PBC did not respond to this letter.

77. CSC furnished 60,643 pounds of steel relating to the temporary cross frames, for which PBC paid CSC $0.933 per pound.

78.     CSC seeks an additional $29,533.14 for the temporary cross frames (($1.42-$0.933) x 60,643).

## CONCLUSIONS OF LAW

1.      This Court has jurisdiction over the claims alleged herein under 28 U.S.C. § 1332 because the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and the claims are between citizens of different states.

2.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

3.      Defendants maintain sufficient contacts in South Carolina for the exercise of personal jurisdiction over them by this court.

4.      With respect to the six issues raised by PBC in support of its withholding of payment, the court concludes the following:

### a.      Straddle Bents

5.      The court concludes that Plaintiff CSC met its burden of proof on this issue. Because CSC calculated the weights associated with the straddle bents using the same method it used to calculate the weights associated with all of the other steel it fabricated for the Project, and because CSC supplied 876,701 pounds of steel relating to the straddle bents but was paid for only 865,266 pounds, the court concludes that PBC is liable to Plaintiff for an additional $16,809.45 ((876,701 – 865,266) x $1.47).

### b.      Increase in Web Thicknesses

6.      The court concludes that PBC did not meet its burden with respect to this issue.

7.      The record remains unclear about the number of stiffeners used in the Project and whether that number in fact increased or decreased in connection with the increase in web

thicknesses.[2] Additionally, the record does not contain sufficient evidence of the difference between the cost of the increased web thicknesses versus the cost of any increase or decrease in the number of web stiffeners. Because this dispute is impossible for the court to unravel, the court must make its determination based on the project as a whole.

8.  Ultimately, the court concludes that with respect to the issue of increased web thicknesses, CSC is entitled to payment for the steel it actually furnished to PBC at the unit cost of $0.933 per pound, as provided by the Purchase Order. Here, CSC furnished 1,024,054 pounds of steel relating to the increase in web thicknesses, but PBC only paid for 961,543 pounds. Accordingly, the court concludes that CSC is entitled to an additional $58,322.76 ((1,024,054 – 961,543) x $0.933).

### c.  Intermediate Cross Frames

9.  The court concludes that PBC did not meet its burden with respect to this issue.

10.  Because CSC supplied 1,663,834 pounds of steel relating to the intermediate cross frames but was paid for only 1,075,240 pounds, the court concludes that CSC is entitled to an additional $549,158.20 ((1,663,834 – 1,075,240) x $0.933).

### d.  Cross Box Diaphragms and End Plate Diaphragms

11.  The court concludes that CSC met its burden of proof on this issue.

12.  Thus, the court concludes that the cross box diaphragms and end plate diaphragms constitute a substantial deviation in design, entitling CSC to the increased unit cost of $2.77 per pound for cross box diaphragms and $3.43 per pound for end plate diaphragms for all of the Lines,

---

[2] In fact, the parties were still attempting to count the number of web stiffeners on the eve of trial.

14

not just for Line 3.[3]

13.     CSC furnished 30,294 pounds of steel relating to the cross box diaphragms and 141,507 pounds of steel relating to the end plate diaphragms, and the court concludes that PBC is liable for an additional $55,650.08 for cross box diaphragms (($2.77 - $0.933) x 30,294 pounds) and an additional $353,342.98 for end plate diaphragms (($3.43 - $0.933) x 141,507 pounds).

### e.     **Tie-In Steel**

14.     The court concludes that PBC met its burden of proof with respect to the issue of tie-in steel.

15.     Thus, the court concludes that the fabrication of the tie-in steel does constitute a substantial deviation in design resulting in a reduced unit cost of $0.61 per pound. Accordingly, Plaintiff is not entitled to payment for 1,655,612 pounds of tie-in steel at $0.933 per pound, and the court rejects Plaintiff's assertion that PBC owes CSC an additional $534,762.68 (($0.933 - $0.61) x 1,655,612).

### f.     **Temporary Cross Frames**

16.     The court concludes that CSC met its burden of proof with respect to this issue.

17.     Thus, the court concludes that the fabrication of temporary cross frames does

---

[3] The court found both Bob Rice and John Gray to be credible and honest witnesses. The court believes that John Gray authorized Rice to proceed at the increased unit costs of $2.77 per pound for cross box diaphragms and $3.43 per pound for end plate diaphragms for Line 3, but that Gray did not authorize these prices for all of the other lines. Had Gray been asked specifically about the other lines, he may or may not have done something differently. Nevertheless, based on all of the testimony and evidence, the court finds that it was entirely reasonable for CSC to rely on Gray's approval of Line 3 to go ahead with the other lines at the increased unit costs of $2.77 per pound for cross box diaphragms and $3.43 per pound for end plate diaphragms. This issue appears to have resulted from an honest misunderstanding between the parties; in any event, the court finds that it was reasonable for CSC to rely on Gray's approval of Line 3 as applying to all other lines. Gray had the authority to approve all of the lines, and Rice had no reason to question Gray's authority.

constitute a substantial deviation in design and that Plaintiff CSC is entitled to payment at a unit cost of $1.42 per pound for 60,643 pounds of temporary cross frames, resulting in an additional $29,533.14 owed to CSC (($1.42-$0.933) x 60,643).

18.     Lastly, the court concludes that Defendants made a reasonable and fair investigation into the merits of Plaintiff's claims and paid the portions of those claims that they determined were valid. The fact that the court later found against Defendants in certain particulars does not imply that Defendants' investigation and resulting decisions were unreasonable or unfair. Accordingly, the court concludes that Defendants are not legally liable for reasonable attorney's fees pursuant to S.C. Code Ann. § 27-1-15.

## CONCLUSION

For the foregoing reasons, it is **ORDERED** and **ADJUDGED** that Plaintiff CSC is entitled to an additional $1,062,816.61, plus interest thereon from February 18, 2005, at the legal rate of 8¾ percent, pursuant to S.C. Code Ann. § 34-31-20.

**AND IT IS SO ORDERED.**

_____
PATRICK MICHAEL DUFFY
United States District Judge

**Charleston, South Carolina**
**June 20, 2006**

16